Alexander Del G-iorno, J.
This is a claim by the administrators of the estate of Ronnie Maull to recover damages in the sum of $50,600 for the wrongful death by drowning of the said Ronnie Maull, an infant six years of age. The claim has not been assigned.
On Sunday, July 3, 1955 the claimants and their two sons, Charles, aged eight, and Ronnie, went from Hackensack, New Jersey, to Sebago Lake Beach, a part of Bear Mountain *500 Harriman Interstate Park, maintained by the State as a public recreational facility. They arrived at about noontime, proceeded to a picnic area behind the beach house, set up a picnic site and stored their food and other gear.
At about 2:00 p.m., the father took the two boys to the swimming area where they played in and about the water for some time. They returned and then he took them to the wooded area beyond the picnic site where they remained about 15 minutes.
' Upon their return to the picnic area, the boys pleaded with their parents to take them to the swimming area again. After about 20 minutes of such pleading, the mother took them to the water. The mother testified that it was then between 2:30 p.m. and 2:45 p.m.
The mother stated that she sat on the sand some 6 feet to the left of the center lifeguard stand and about 15 feet from the spot in the water where the children were playing with 4 other boys in about 3 feet of water. There was a lifeguard on the stand.
Mrs. Maull said that for some 15 minutes she watched the children playing leapfrog and ducking their heads under water as they jumped. At the end of that period of time she noticed all the children ducking under the water and then all coming up and standing up, except Bonnie. Fearful, she ran into the water and began searching for Bonnie, asking Charles where his brother was. Charles said he did not know what had happened to Bonnie. She ran out of the water to the lifeguard and asked him to come find her son. The guard asked her how old he was, and she alleges he added, “ Oh, a child can’t drown there. The water is too shallow”. She claims he did not respond to her plea and that she searched for another 6 or 7 minutes, when she saw a crowd about an unknown man who was carrying a body, that of her son, from the water to the beach in the direction of the lifeguard stand.
She testified further that she ran toward the crowd gathered on the sand where she saw the lifeguards administering artificial respiration to her son. After a short while an oxygen tank was brought and a mask was applied. She contends that there must have been life in her boy because she saw a little balloon through which oxygen passed, inflating and deflating itself for 10 minutes. After an interval of 10 minutes more, another oxygen tank was substituted.
At this time, the park doctor arrived, ordered the mother taken away and administered some injections to the boy’s chest to determine if life was still there.
*501 The father of the boy, having been called by the boy Charles, said he arrived at the scene in time to see the first balloon working for a minute or more, indicating to him that there was life in the body. He testified that then the lifeguards received another tank, and in less than a minute changed from the old to the new tank, but that the bladder now did not move. At all times manual respiration was being constantly applied. The father testified further that the boy’s body never moved.
Charles S. Grulino, the lifeguard whom the mother accused of not responding to her plea to find her son, testified that he had been a lifeguard at Sebago Lake Beach for four Summer seasons before the year 1955; that he had a Bed Cross certificate certifying to his qualification as a lifeguard and the care of those who suffered from immersion under water. He testified, further, that he had just arrived at the center lifeguard stand to relieve another guard for lunch and that, just as he was about to ascend the stand, Mrs. Manll approached and said her boy was lost. She pointed out a spot about 50 feet from where they stood as the place where he had been playing.
He asked her to look into that area where there were a number of other colored boys. He stated that he suggested the boy might be there, because many times children thought in danger would be found only to have strayed to another location. He said he asked these questions in order to know where to go for the boy, but that meanwhile he was scanning the water. As this short conversation was taking place, lasting not more than a minute, he saw an unknown man carrying the limp body of the child from the water.
He stated that when help is needed, a guard is required by the park rules to blow his whistle three times, and that while thus talking to Mrs. Manll he did blow his whistle, with the result that as the boy was being brought in, Masaris, the other lifeguard, ran towards the man carrying the boy’s body, and so did he, Grulino. They both brought the boy in, there being no indication that he was alive. Immediately and alternately they both began giving artificial respiration which they continued without interruption for one and one-half hours. In addition, the two oxygen tanks and a respirator from the ambulance which came from Sloatsburg were used, and the doctor made the injections as stated.
The boy never showed any signs of life. There was water coming out of his mouth as the artificial respiration was continued. This phenomenon, it was testified, occurs whether or not there is life in the body. It is caused by the pressure applied against the body when giving artificial respiration.
*502 Claimant’s Exhibit 8, which was the photograph of the beach, was placed before Gulino. He was asked to indicate on the photograph where the mother allegedly pointed out the location where her son had disappeared, and also where he claims he first saw the man carrying the boy’s body. It is to be noted that the mother had marked the photograph with the letter Y indicating where the children were playing. The water at Y is very shallow. It is about 15 feet in front and to the left of the lifeguard stand. Gulino wrote the letter C to indicate the spot the mother pointed out to him where the boy had disappeared. He explained that this spot was some 50 feet in front of but to the right of the lifeguard stand. At that spot the water was up to the middle of an average person’s body. He also indicated by the letter M where he first saw the man carrying the body. M is much more to the right of the lifeguard stand that even the afore-mentioned location marked C. There is a marked variance in the testimony of the mother and Mr. Gulino on this very important element of this case.
He asserted that he used the latest approved method of resuscitation, namely, the shoulder-arm lift method which exudes water, whether the victim is alive or dead. He stated he never refused to give aid. After one and one-half hours of the application of artificial respiration, when the boy was officially pronounced dead by the doctor, he went back to the beach house. He said that nobody made any complaint against him to his superiors, but that because he was so affected emotionally by this drowning, he resigned his job the following day.
Raymond J. Mesaris, who is now a patrolman for the Interstate Park Commission, stated he had gone to relieve Gulino and was about to climb the lifeguard stand when he heard the man in the water, jumped down and ran to him in four seconds. The rest of his story parallels Gulino’s: he heard the whistle blast as he ran into the water; the body was lifeless then; he confirms the continued application of artificial respiration, the use of the oxygen, the supply of which never ran short and the injection by the doctor without any reaction in the body. He testified, too, that oxygen from the tank courses through a reducing valve into a one-foot square bag, and that as the lungs are depleted oxygen goes from the bag into the lungs. This causes an inflating and deflating action of the bag and occurs to fill the void in the lungs whether there is life or not.
Despite the natural sympathy we feel towards the bereaved sufficient evidence from which it can be found that the proximate *503 cause of the death of the decedent was a failure to exercise reasonable care in the maintenance, control and supervision of the bathing area at Sebago Lake Beach, where the accident occurred. The State is not an insurer of those who make use of its park facilities. The law requires that it shall exercise reasonable care in the maintenance of its parks and in the supervision of their use by the public. (Clark v. City of Buffalo, 288 N. Y. 62, 65; Curcio v. City of New York, 275 N. Y. 20, 23.) It is bound to exercise only the degree of care that would be expected of an ordinarily careful and prudent person in a like position, and the duty is fulfilled when it makes the place as little dangerous as such a place can reasonably be made, having regard to the contrivances necessarily used in conducting such a place. (Ingersoll v. Onondaga Hockey Club, 245 App. Div. 137.)
In the case of Maher v. Madison Square Garden Corp. (242 N. Y. 506) the evidence established that plaintiff’s intestate, a boy 14 years of age, was drowned in a swimming pool conducted for profit by the defendant. Though the swimming pool was. crowded at the time, apparently no one saw the fatality. He was playing in the pool one afternoon and his dead body was found in another part of the pool the next morning, and that death was caused by asphyxiation. The court held (p. 507) that “No inference can be drawn that by act or omission of the defendant or any of its employees the boy was placed in a position of danger which caused his death, or that any greater care by the defendant could have averted accident”.
Sciarello v. Coast Holding Co. (242 App. Div. 802, affd. 267 N. Y. 585) involved an action to recover damages for personal injuries sustained as the result of the alleged negligence of the defendant. Plaintiff, a patron of the bath, slipped on the wet floor at the edge of the pool and fell. In dismissing the complaint, the court held (pp. 802-803) that the “ slippery condition of the platform surrounding the defendant’s swimming pool was necessarily incidental to the use of the bath. There was no proof of the violation of any duty or obligation on the part of the defendant to provide a covering for the floor at the point where plaintiff fell”. (Citing Beck v. Broad Channel Bathing Park, 231 App. Div. 734, affd. 255 N. Y. 641.)
One who engages in such a sport as swimming accepts the dangers inherent in the sport so far as they are obvious and necessary. (Curcio v. City of New York, 275 N. Y. 20, supra, citing Murphy v. Steeplechase Amusement Co., 250 N. Y. 479.)
Here, there was no witness to the drowning of the child. Concededly he was picked up in a location quite distant from, *504 and where the water was much deeper than the place where the mother said she had seen the hoys playing. As any mother would, she tried desperately to find him when she did not see him above water. While she ran into the water, asked questions and then returned to talk to Gulino, it is reasonable to assume from the evidence before the court that the boy had drowned during the interval. Aside from determining whether Gulino should have jumped into the water without asking the questions he did, asphyxia must nonetheless have been complete. With respect to the lifeguard Gulino, however, the court considers that he was a competent lifeguard. His questioning the mother as to where she had last seen her boy was to enable him to proceed to the correct location in the water to find the boy. The court disregards the innuendo that Gulino refused to act on behalf of the boy, for the testimony indicates that he was a conscientious lifeguard who was doing what he considered his duty, in accordance with the rules of the park and the necessities of the occasion.
Further, the evidence indicates that there was no defect in the mechanism of the inhalator and that artificial respiration was administered in a manner accepted and approved by the American Bed Cross. There was no evidence that the State had any knowledge of any defect in the mechanism of the inhalator. Nor was there any evidence as to what caused the death of the child, except that he died from asphyxiation as a result of drowning, Under all of the circumstances, the court finds that the State did all it possibly could have done for the boy.
The claimant has failed to establish that the proximate cause of death was a failure by the State to exercise reasonable care in the maintenance, control and supervision of the park. The State cannot be charged with liability for the death of the decedent. The claim is dismissed.
This memorandum constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.